**SO ORDERED.**

**SIGNED this 17 day of August, 2005.**



_____
       **ROBERT E. NUGENT**
    **UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LARRY JEAN JAMISON | ) | Case No. 03-14735 |
| | ) | Chapter 7 |
|     Debtor. | ) | |
| _____ | ) | |
| | ) | |
| MARY E. MAY, United States Trustee | ) | |
| | ) | |
|     Plaintiff, | ) | |
| v. | ) | Adversary No. 04-5045 |
| | ) | |
| LARRY JEAN JAMISON, | ) | |
| | ) | |
|     Defendant. | ) | |
| _____ | ) | |
| | ) | |
| ROBERT PAGE, | ) | |
|     Plaintiff, | ) | Adversary No. 04-5066 |
| v. | ) | |
| | ) | |
| LARRY JEAN JAMISON, | ) | |
| | ) | |
|     Defendant. | ) | |

1

<span style="color: blue">Case 04-05045   Doc# 74   Filed 08/17/05   Page 1 of 16</span>

|                                    )    |
|                                    )    |
| **CARL B. DAVIS, Trustee,**        )    |
|                                    )    |
|     Plaintiff,                     )    Adversary No. 04-5160
| v.                                 )    |
|                                    )    |
| **LARRY JEAN JAMISON,**            )    |
|                                    )    |
|     Defendant.                     )    |
|                                    )    |

## MEMORANDUM OPINION

In three separate adversary proceedings, the United States Trustee, creditor Robert Page, and case trustee Carl Davis, all object to Larry Jean Jamison receiving a discharge in this case. This Court consolidated the three proceedings for discovery and trial.[1] The plaintiffs seek an order finding that Jamison transferred or concealed assets within one year of his petition date with intent to hinder, delay, or defraud his creditors in violation of 11 U.S.C. § 727(a)(2)(A). They also claim that Jamison made one or more false oaths or statements, another ground for the denial of a discharge under 11 U.S.C. § 727(a)(4). After a daylong trial conducted on July 13, 2005, the Court has carefully considered the evidence[2] and makes the following findings of fact and conclusions of law as contemplated by Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052.

## FINDINGS OF FACT

Larry Jean Jamison's Petition

---

[1] The adversaries were consolidated under Adversary No. 04-5045. Dkt. 19. Unless otherwise indicated, all docket references are to No. 04-5045.

[2] The Court notes that the parties jointly submitted trial exhibits.

2

Debtor filed his Petition, Schedules and Statement of Financial Affairs in this court on August 28, 2003. None of these documents has been amended since the petition date. The Petition is filed in Larry Jean Jamison's name. The field providing for disclosure of any other names used (including trade names) in the preceding six years was left blank.

Debtor's Statement of Financial Affairs ("SFA") contains the following notable inclusions and omissions as identified by the applicable question number: (1) Question 1 reflects that debtor earned income from a "business," but discloses no income from an "other source" as is requested by Question 2; (2) debtor's answer to Question 4(a) lists a number of state court collection lawsuits, some in judgment, and most involving one or more of the following entities: Larry Jamison Body Shop, Larry Jamison d/b/a Jamison Body Shop, LJ's Midtown Body Shop, and J&J Auto Sales. Debtor responded "none" to Question 4(b) relating to property seized by writ; (3) debtor's response to Question 5 disclosed no repossessions; (4) debtor answered "none" to Question 7 regarding gifts made within a year; (5) debtor likewise answered "none" to Question 10 concerning other transfers; (6) debtor disclosed the existence of two closed bank accounts (Fidelity Bank and Prairie State Bank) in response to Question 11; (7) debtor answered "none" to Question 14 which seeks "List all property owned by another person that the debtor holds or controls;" and (8) debtor answered "none" to Question 18 which requests information about any businesses in which debtor may be involved.

Debtor's schedules are similarly sparse. On schedule A, he shows no real estate ownership. Schedule B discloses the ownership of no cash, no checking or other bank accounts, no vehicles, nor any other property beyond his clothes and personal effects ($500), household goods ($500), and tools ($700), all of which are claimed exempt on Schedule C. On Schedule D, debtor listed no secured creditors. On

3

Schedule E, debtor listed only sales and state withholding tax obligations, omitting any mention of obligations to the Internal Revenue Service. Debtor disputes the "unpaid sales tax from business operation" of some $11,672. Only Schedule F, consisting of 13 pages, is heavily populated with the names and addresses of many creditors whose claims appear to arise from the conduct of some of the same businesses mentioned in the SFA. Nearly all of these claims are disputed. Schedule G references a lease of computer software from CIT and a real estate lease from plaintiff Robert Page. Schedule H discloses no codebtors. Schedule I states that the debtor is a self-employed "handyman" (for 3 years) whose employer's address is "unknown" and who earns $1,500/month "from operation of business or profession or farm." No detail concerning such business operation is attached as requested by Schedule I. Curiously, debtor does not disclose his age and states that his marital status is "unknown." He lists no dependents on Schedule I but claims, on Schedule J, $250 monthly for support payments of additional dependents not living with him. Schedule J also shows no regular expenses from the operation of a business. Notwithstanding that debtor is supposedly self-employed, he reports $375 per month in withheld taxes and social security. As required by the Bankruptcy Code and Rules, debtor signed his Petition, SFA, and Schedules under penalty of perjury.

In short, a busy case trustee or creditor could scan these schedules and SFA and, taking them at face value, conclude that the case of Larry Jean Jamison was a typical no-asset case, unworthy of much further investigation, far less administration. As revealed at trial, however, that conclusion would be very, very wrong.

### Debtor's Family Business Activities

Larry Jamison is far from being a humble self-employed handyman. In fact, he professes to have

4

been in the auto-body repair business and related pursuits for much of his life. Much of his family is also involved in these businesses. Larry's two brothers, Dean Jamison (now deceased), and Chris Love have been active in the business with him. Testimony revealed that Larry has been actively involved in some capacity in a number of unincorporated enterprises. They include: Larry's Auto Sales, Larry Jamison Body Shop, LJ's Midtown Body Shop, Mobile Auto Trim, Jamison Dent Repair, and J&J Auto Sales. From December, 2000 until June, 2003, Larry, Dean and Chris conducted body repair, dent repair, and auto sales at 1113 E. Waterman in Wichita, leasing the premises from plaintiff Page. After Page evicted them in 2003, these businesses moved to 2300 N. Nelson Drive in Derby, Kansas, a suburb several miles southeast of Wichita.

Each of these businesses had separate bank accounts, each of which was "owned" by some Jamison family member other than Larry. Nonetheless, Larry was authorized to sign checks on all of them and, the evidence shows, he signed almost all of the checks on each account. Larry downplayed his involvement in these businesses, testifying that he did work for each of his brothers and was only "there to help out." He was active in the business, he said, because people in Wichita knew him from his longtime involvement in the auto body business.

Larry says that at the petition date, Dean Jamison owned the dent repair business and Chris Love owned the Mobile Auto Trim business. Larry's daughter Jeana Credile owned J&J Auto Sales, which is a successor to Larry's Auto Sales, and his other daughter, Linsi Jamison-Smith, owned the body shop. Chris and Larry live in the same house in Derby. According to Larry, the house is titled in Chris's name, but Larry contributed some $25,000 from his VIP retirement account at Boeing to the purchase. Larry also contributes $300 a month toward the house payment, either in cash or in work done for Mobile Auto

5

Trim. According to Chris, the house is now in foreclosure.

<u>Transfers/Concealment of the Businesses</u>

Larry professes to have ceased any ownership in either the repair or auto sales businesses long before the one year look-back date of August 28, 2002. The Court has attempted to trace the lineage of these enterprises based on the often unclear and questionable testimony presented at trial.

### 1. Larry Jamison Body Shop ("LJBS")

LJBS formerly did business at 2001 S. Broadway, apparently adjacent to Larry's Auto Sales, where Larry sold cars for some period of time during the 1990's. LJBS moved to the 1113 E. Waterman location in an area of Wichita loosely referred to as "Old Town," after obtaining the lease from Page on December 27, 2000. Larry said that he intended to partner with another (unnamed) body man in establishing LJ's Midtown Body Shop. Jeana testified that she took over the body shop and "owned" it until passing it on to her sister, Linsi, in May or June of 2001. The Court notes here that Larry not only signed the lease with Page, but also signed the first rent check. The lease was taken in the name "Larry Jameson [sic] d/b/a L.J.'s Midtown Body Shop."[3] Sometime in July of 2002, Linsi opened a Fidelity Bank checking account for "LJ's Midtown Body Shop DBA Jamison's Body Shop and Paintless Dent Repair," with the 1113 E. Waterman address. Larry was an authorized signer on the account. In June of 2002, Linsi was named on the Sales Tax Certificate for the shop.

Page evicted the Jamisons in mid-2003 due to nonpayment of rent and on June 25, Larry signed a new lease with K-15 Storage for a 4,500 square foot commercial building at 2300 N. Nelson Drive in

---

[3] Ex. 2.

Derby.[4] This lease was not disclosed on Schedule G. "Larry Jamison" is named as the tenant and the lease recites that the space is to be used for "Auto Body Repair, Striping & Paintless Dent Repair." Larry is named as the contact person for the tenants and a photocopy of his driver's license was an exhibit to the lease. Chris Love wrote the rent deposit check on an account entitled "Dean Jamison DBA Jamison's Paintless Dent Removal" of 1113 E. Waterman. The check was drawn on the Prairie State Bank.

Linsi testified that she closed the body shop business in October of 2003 because she was embroiled in a divorce and because the business was fraught with credit and tax problems. During 2003 and 2004, Linsi worked as a waitress at Harry's Uptown Bar in Wichita.

### 2. Dent Repair and Auto Trim

Dean Jamison operated the paintless dent repair business prior to his death in May of 2004. This business was established before 2000 and, at one time, Larry owned it. Dean also owned Mobile Auto Trim, as did Larry. Now, Chris Love owns it. Chris testified that, at one time, Larry and Dean were "partners" in the dent business, but that once Dean began to "chase hail," Larry simply worked for him.[5] Currently, Larry does paintless dent repair and vehicle striping for Chris in the Mobile Auto Trim business.[6] Mobile Auto Trim has always operated under the "umbrella" of the body shop.

### 3. Auto Sales

Larry operated Larry's Auto Sales at 2001 S. Broadway in Wichita for a number of years. Jeana

---

[4] Ex. 3.

[5] "Chasing hail" is Larry's term for the practice of traveling to hail-damaged areas to provide body work service.

[6] This is inconsistent with Schedule I where Larry states that he has been a self-employed handyman for the past 3 years.

7

testified that she "opened" J&J Auto Sales sometime in 2003. In evidence is a copy of a liability insurance binder dated March of 2003 and reciting that the business will be conducted at the 2300 N. Nelson, Derby location. Jeana also testified that J&J previously shared space with the body shop on Waterman, but paid no rent. She held dealer license no. D-1608 which, until 2002, had been Larry's number. Larry applied to the Department of Revenue to be a sales person for Jeana. The phone number for J&J was Larry's cell phone number. Like Linsi, Jeana was elsewhere employed, working at the Dillons grocery store and only reporting to the "dealership" when her father or uncles would advise her that someone wished to see a car. On the same day that Linsi opened a Fidelity account for LJBS, July 3, 2002, Jeana opened one for J&J. And, like the LJBS account, Larry had signatory privileges.

The dealership was a small operation. Jeana testified that there were only three or four cars there for sale. Jeana was hard-put to tell the Court the makes and models of the cars. She received $100 for each car she sold with the balance of the profit, if any, going into the J&J account. According to her, there was little profit. In one of the few glimmers of candor at trial, Jeana plainly stated that she got into the car business at her uncle's and father's request because their credit was too poor. It appears that the main purpose of the dealership is to provide the Jamison clan with dealer or "drive-away" tags which they can attach to vehicles and operate without paying title or registration fees or dealing with property tax concerns. Jeana testified that, as a result of her involvement in the business, her credit was also damaged.

Larry's Actual Control of the Businesses

Summarizing a day's testimony, the Court concludes that Larry conducted himself as a "front man" for each of the businesses. His involvement is the common element in each of them. Larry signed checks on each business's account (except possibly Dean's business account), living on the proceeds of the

8

enterprises with the apparent assent of the various "owners."[7]

While Larry minimized his day to day involvement in his testimony, the unchallenged testimony of his kin is clearly contrary. Dustin Green was a painter who leased a paint booth from Jamison first at Waterman, then at the Nelson location. Green testified that Larry was "in and out" of the shop frequently. Green stated that Larry was there all the time and that he dealt with Larry most of the time. It is clear that Larry essentially ran the body shop even after Linsi supposedly "took over," because both Linsi and he testified that he frequently covered for her, both during her confinements, when her child was ill, and while she was getting divorced. In response to a question from the Court, Larry stated that he had to run the body shop for her because she wrote too many bad checks. Chris likewise testified that Linsi was rarely present and that testimony was corroborated by Dustin Green. Larry testified that he placed orders for the body shop. As on all the accounts, Larry was authorized to sign on the body shop account.

As noted above, while she purportedly ran the dealership, Jeana worked full time at another job and relied on Larry and her uncles to locate used car inventory and talk to customers. She was only present at J&J when the uncles called her to be there. Larry wrote checks on J&J's account. He dealt with the insurance company that wrote the dealer's liability policy. Jeana received $100 for each car sold, with the balance being returned to the J&J account for use in other pursuits.

Larry was also heavily involved in Mobile Auto Trim. As noted above, Chris Love has owned this

---

[7] Except for Jeana's testimony that she became owner of J&J auto Sales "sometime in 2003," and that she passed ownership of the body shop to Linsi in 2001, there was no testimony pinpointing the times when Larry's ownership interest in the businesses purportedly ceased or was transferred by him. Nor was documentary evidence presented to show any transfer by Larry to his family members of his one-time ownership in the various auto businesses.

9

business for three years, but Larry owned it at one time. Chris stated that he trusted Larry to write checks on his account and that he did not care if Larry wrote personal checks on Mobile Auto Trim. Larry testified that he had to write checks for Chris due to a mental impairment Chris sustained in a motorcycle wreck in their youth. Chris denied this, but he did state that all of the businesses were family businesses and that all the Jamisons shared the funds in the accounts.

Thus, despite Larry's insistence to the contrary, the Court concludes that he was an integral actor in each enterprise and a material beneficiary of all of them. This conclusion is buttressed by the fact that Larry made a credit application to the Prairie State Bank and signed all of the notes and security agreements given to that institution. In August of 2000, Larry made application to the Bank for a $19,000 loan and listed his employer as "Mobil [sic] Dent and Larry's Auto Sales." He stated that he received "salary" of $5,000 gross and that he received an additional $500 per month from "Mobil [sic] Auto Trim." On August 30, 2000, he gave a note and security agreement to the Bank for $19,963.34, the repayment of which was to be secured by a purchase money interest in a 1999 Chevrolet Blazer. Although this note remains outstanding, Larry omitted it from his schedules. In the security agreement portion of the document, Larry represented that he owned the vehicle in question, although his loan officer testified that, to his knowledge, the vehicle had never been titled and that the Bank considered it as being held for resale. In 2001, Larry's banker wrote a "Watch List Action Plan" memo to his loan file. In the report, the banker stated, "Larry opened a new body shop in March which adds to his income from the mobile dent repair." He went on to state that Larry anticipated increased revenue from the shop and his dent repair business.

Larry had previously signed several notes at Prairie State, including one for the purchase of two Sea-doo personal water craft in which he granted the bank a purchase money lien. Neither this note, nor

10

the Sea-doos, were disclosed on the Schedules. Larry said they belonged to Dean. Larry also signed a note to refinance a "work truck." This note was not disclosed on his Schedules. Larry said this truck belonged to Chris. Needless to say, the truck was not scheduled either.

Larry signed both the Page lease at Waterman and the K-15 Storage lease at Derby. He omitted to schedule the latter lease. K-15 Storage's agent, Shelly Dunnegan, testified that Larry was on all of the paperwrk in connection with the Derby lease. She stated that she dealt with Larry and Chris, but that eventually she tired of speaking to Larry and preferred to deal with Chris. She usually received checks from Chris for the lease payments.

Nothing undercuts Larry's professed lack of ownership interest in these businesses more than his conduct concerning the checking accounts. The Loss Prevention Manager at Fidelity Bank testified to her familiarity with three of the Jamison accounts, Mobile Trim, LJ's Midtown, and J&J. She stated that based on her review of Mobile Trim account activity from 1999 on, Larry appeared to have signed most of the checks. Her review of activity on the body shop's account showed that Larry signed most of the checks, including checks to his former wife for child support and checks to several bowling alleys where he bowls. She stated that Larry appeared to be the primary user of both these accounts. She reached similar conclusions concerning Larry's use and control of the J&J account, noting his having written many checks, including a rent check to Bob Page, an insurance premium check to Smalley Insurance, as well as numerous checks to cash, the bowling alleys, and to Linsi.

Larry's position is further eroded by his manifest lack of credibility. Beginning with his assertion to plaintiff's counsel that he could not identify the first exhibit (his Schedules and SFA) because his "glasses were broken," continuing with his testimonial statements being repeatedly impeached with prior sworn

11

testimony, and culminating in his statements about his brother's impairment that were directly refuted by Chris Love himself, much of Larry's testimony was dubious at best. Much of the Jamison witnesses' testimony was inconsistent and contradictory, Jeana's statements being the notable exception. Linsi's testimony that she served at the body shop as owner, accountant, office manager, buyer, and personnel manager clashed with her repeated statements that she was not often present due to child care responsibilities.

<u>Larry's Failure to Cooperate with the Trustee and Creditors</u>

Trustee Davis attempted to secure a variety of information from Larry commencing with the first § 341 meeting of creditors. At that time, Larry testified that the information on the petition and schedules had been developed from a box of documents provided by Larry to his counsel. Notwithstanding Davis' repeated efforts (and this Court's order), very few of these documents have ever been produced and what few have emerged did not come to light until the autumn of 2004, at least one year after the petition date.[8] Larry attempted to block or tamper with the trustee's efforts to sell property he found at Larry's business premises by asserting his family's or a third-party's ownership of the assets.[9] Trustee Davis testified, and the Court believes, that his administrative efforts have been severely hampered by Larry's failure to make a complete disclosure of the nature of his affairs.

## **CONCLUSIONS OF LAW**

---

[8] *See* Case No. 03-14735, Dkt. 18 and Dkt. 37 (Trustee's motion to compel discovery from debtor and order granting); Case No. 04-5066, Dkt. 28 and Dkt. 52 (Creditor Page's motion to compel interrogatory answers).

[9] *See* Case No. 03-14735, Dkt. 5, Dkt. 8 and Dkt. 30 (Trustee's motion to sell frame machine and order granting).

12

Case 04-05045    Doc# 74    Filed 08/17/05    Page 12 of 16

Section 727(a)(2)(A) provides:

> The court shall grant the debtor a discharge, unless – . . . (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed – (A) property of the debtor, within one year before the date of the filing of the petition;

In order to prevail here, the plaintiffs must show by a preponderance of the evidence that Larry Jamison transferred, removed or concealed assets with intent to defraud within one year of the date of his petition.[10] Courts have cited several factors from which a debtor's fraudulent intent may be inferred: (1) concealment of prebankruptcy conversions; (2) conversion of assets immediately before filing bankruptcy; (3) gratuitous transfers of property; (4) continued use of transferred property; (5) transfers of property to family members; (5) conversion after entry of a large judgment against debtor; and (6) debtor's engagement in a pattern of sharp dealing prior to bankruptcy.[11]

    Larry argued at trial that he could not have concealed any assets because there was nothing to conceal. While he is correct that the proof here is difficult, it is made more difficult by Larry's lack of candor. It is not, however, insurmountable. The Court concludes that Larry has been less than forthcoming about his affairs, first with the trustee and then with this Court. Whatever one might style his business, it is clear that the Jamison family is involved in some corporate enterprise, be it a partnership, a joint venture, or some other unincorporated undertaking. Larry conducted himself at all times as though he owned the assets of these businesses, freely using the supplies, the venue and, most important, the money for his own

---

[10] *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1293 (10th Cir. 1997).

[11] *The Cadle Company v. Stewart (In re Stewart)*, 263 B.R. 608, 611 (10th Cir. BAP 2001).

13

purposes. While it is not clear that he made any transfers within the one-year period,[12] he did conceal his interest in these businesses by hiding them behind the sinecures of his family members – J&J through Jeana, LJ's through Linsi, and Mobile Trim through Chris. There is only one reason to conduct business this way and that is to confound one's creditors. Larry's conduct in this case leads the Court to firmly conclude that he did conceal his interest in these automotive businesses and did so, with the intent to defraud his creditors.

To prevail on the false oath count under § 727(a)(4)(A), the plaintiffs must show that Larry Jamison knowingly and willfully, with intent to defraud, made a false oath concerning a material fact.[13] The information is material if it concerns the existence and disposition of the debtor's property.[14] Fraudulent intent may be deduced from the facts and circumstances of the case.[15] The trustee and creditors should not be compelled to conduct an extensive investigation of the debtor's assets and transaction, but rather should be able to rely upon the information provided in the bankruptcy pleadings and schedules.[16] The debtor's opinion that the undisclosed assets or transactions are worthless or immaterial is not a valid defense under § 727(a)(4). The greater the number of assets or transactions that are not disclosed, the

---

[12] To obtain denial of discharge based upon a fraudulent transfer, the plaintiffs must prove: (1) that transfer of property occurred; (2) that debtor owned property transferred; (3) that transfer occurred within 1 year of filing petition; and (4) at time of transfer, debtor had intent to defraud creditor. *Holaday v. Seay (In re Seay)*, 215 B.R. 780 (10th Cir. BAP 1997).

[13] *Job v. Calder (In re Calder),* 907 F.2d 953, 955 (10th Cir. 1990); *Gullickson v. Brown (In re Brown),* 108 F.3d 1290, 1294 (10th Cir. 1997).

[14] *Calder,* 907 F.2d at 955; *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir. 1984) (rejecting value test for materiality of omission from bankruptcy schedules).

[15] *Calder*, 907 F.2d at 956.

[16] *Id.*

greater the inference of intent to defraud.[17] Mere honest mistake or inadvertence is not a basis for denial of discharge.[18] And evidence of fraudulent intent is lacking where the debtor comes forward with omitted information on his own accord.[19]

Larry's Petition omissions are not mere inaccuracies or honest errors, nor were they isolated. Larry was in control of all of these businesses. The failure to disclose the K-15 Storage lease, the site from where the businesses were conducted, is material.[20] He knew what was under each shell of the shell game, but, even under penalty of perjury, he failed to disclose what he knew and what he owned on his Schedules, his SFA, at his creditor's meetings, and in Court. His failure to provide the details of his "self-employed" income and expenses on Schedule I and J is another effort to conceal his business operations. Larry's failure to amend his Schedules and SFA, even after the omissions were brought to his attention, is revealing of Larry's state of mind. It would be a travesty to allow him to receive a discharge in these circumstances. His "no harm, no foul" defense must be rejected. As my distinguished colleague Judge Somers has recently stated: "Debtors' false oaths did result in harm. . . . The fact that the monetary value of the assets recovered for the estate was not particularly large does not equate to no harm."[21] The

---

[17] *Brown*, 108 F.3d at 1295.

[18] *Id.* at 1294.

[19] *Id.* at 1295.

[20] The Court observes that the K-15 Storage Lease and the prior lease for the Waterman property, both executed by Larry as the named tenant, contain clauses prohibiting anyone else from occupying the premises without the landlord's prior written consent. *See* Ex. 2, ¶ 9 and Ex. 3, ¶ 14.

[21] *See Thomas v. Haneke (In re Haneke)*, Case No. 02-13894; Adv. No. 02-5244, Unpublished Opinion, p. 17 (April 11, 2005).

15

bankruptcy system's credibility suffers dearly when this conduct goes unpunished.

Judgment should therefore be entered for the plaintiffs and against Larry Jean Jamison denying his discharge under § 727(a)(2)(A) and § 727(a)(4)(A). A Judgment on Decision will issue this day.

# # #